IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
AUGUST 23, 2005 Session

## MELVIN FOSTER, ET AL. v. HAROLD COLLINS, ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-02-1880-1     Walter L. Evans, Chancellor**

_____

**No. W2004-01959-COA-R3-CV - Filed December 27, 2005**

_____

Fourteen members of a church filed a complaint against the church leadership seeking an injunction
to prevent the church from renewing the pastor's contract and to enjoin the church leadership from
utilizing church funds in a manner which displeased them.  The parties ultimately settled the case
by entering into a settlement agreement, which the chancery court incorporated into its order
dismissing the case with prejudice.  Shortly thereafter, the members filed a petition seeking to hold
the church leadership in contempt for violating the terms of the settlement agreement.  The
chancellor found the church leadership to be in civil and criminal contempt of the order dismissing
the case and imposed fines and jail time.  The church leadership appealed to this Court.  After
reviewing the record in this case, we hold that the chancery court lacked subject matter jurisdiction
over this case from the outset.  Accordingly, the resulting order, which served as the basis for the
chancery court's finding of contempt, is void.  We reverse the chancery court's ruling in this case
and dismiss the case in its entirety.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and
Case Dismissed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S.,
and DAVID R. FARMER, J., joined.

Archie Sanders, Memphis, TN, for Appellants, Harold Collins, as Moderator of Mississippi Boulevard Christian Church, Inc., Kym Barnett, Eldredge Williams, Delores Flagg, Susie Williams, Julia Bennett, Edward Reid, Sheilah Easterling, Leroy Norton, Theodore Peasant, Tessera Martin Hardaway, Clyde Hunt, James Hudson, Ervin Isom, Anthony Brown and Veda Bankhead, as the Church Council of MBCC

John S.Golwen, Kristen Wright, Memphis, TN, for Appellant, Dr. Frank Thomas as Senior Pastor of Mississippi Boulevard Christian Church

Patricia A. Odell, Memphis, TN, for Appellees, Melvin Foster, Erma Foster, Laura Cade, Allene C. McGuire, Rholedia Morgan, Marie Brooks, James H. Banks, Nevada M. Banks, Bettye M. Friends, Edward J. Friends, Juanita H. McCoy, and Bettye Briggs, Concerned Members of Mississippi Boulevard Christian Church, Inc.

## OPINION

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Mississippi Boulevard Christian Church, Inc. (hereinafter "MBCC") is a Tennessee non-profit corporation[1] affiliated with the Christian Church and is located in Memphis, Tennessee. MBCC is congregationally governed[2] pursuant to its constitution and bylaws. Dr. Frank Thomas (hereinafter "Dr. Thomas") became the Senior Pastor of MBCC pursuant to an employment contract entered into on July 6, 1999. Pursuant to the contract, Dr. Thomas would continue to serve as Senior Pastor indefinitely, with his employment being subject to review every three years. Dr. Thomas received a base salary of $125,000.00, and the leadership of MBCC, in their discretion, possessed the authority to award Dr. Thomas an annual merit bonus "commensurate with the growth of the Church." The employment contract also established a partnership between Dr. Thomas and an organization called The Ministry of Hope for Life International, Inc. (hereinafter "Hope for Life"). The stated purpose of Hope for Life was to "facilitate the global (national and international) preaching, teaching, writing, and consulting ministry of Dr. Frank Thomas, . . . especially in Africa." During the initial three-year term of Dr. Thomas' contract, MBCC agreed to pay $90,000.00 to Hope for Life to further its stated goals.

On September 30, 2002, fourteen members of MBCC (hereinafter the "Members" or "Appellees") filed a "Complaint for Injunctive Relief" against Dr. Thomas and the leadership of MBCC (hereinafter the "Church Leadership" or, collectively with Dr. Thomas, the "Appellants") in the Chancery Court of Shelby County. In September of 2002, the Church Leadership began

---

[1] *See* Tenn. Code Ann. § 48-67-101 *et seq.* (2002).

[2] "There are two distinct forms of church organization, congregational and hierarchical." 77 C.J.S. *Religious Societies* § 5 (1994). "A congregational church is a church where each local body is self-governing and independent. It is governed by its membership, or by some other local organism, such as a church board." *Id.*

negotiating the renewal of Dr. Thomas' contract. As a result of these negotiations, the Church Leadership approved a new contract with Dr. Thomas to take effect on January 1, 2003. The Members' complaint set forth the following as its primary purpose: "This lawsuit is being filed to enjoin [the Church Leadership] and any of their agents or assigns from entering into any contract with [Dr. Thomas] to continue as Pastor of [MBCC] without the members first having an opportunity to vote on whether they desire Thomas to remain as pastor." The Members also sought to enjoin the Church Leadership from "continuously denying the members of their rights as enumerated in the constitution and bylaws." The Members' complaint contained the following additional statement: "This suit is not purely an ecclesiastical dispute, it involves property rights so that this court has jurisdiction to hear and determine the matters hereinafter set forth." Regarding their alleged property rights, the Members alleged the following:

> 17. At the time Thomas was hired as pastor, [MBCC] was debt free with reserve funds in excess of 2.6 million dollars in the treasury. During Thomas' tenure, tithes and offerings have greatly reduced which has caused the church to encroach upon the reserve for the day-to-day operation of the church. These statistics do not reflect financial growth, which would entitle [Dr. Thomas] to an annual bonus.
>
> . . . .
>
> 19. The [Church Leadership] approved the payment of bonuses to Thomas without a finding that he had properly earned the bonuses by satisfactory completion of predetermined and agreed upon goals.
>
> . . . .
>
> 21. The employment contract between [Dr. Thomas] and [MBCC] provided for a Partnership Agreement between [MBCC] and Thomas. The Partnership is entitled [Hope for Life]. Over the past two and a half years [MBCC] has contributed $90,000.00 to [Hope for Life] without Thomas providing any accounting of the use of the funds nor has Thomas provided any information to reflect that the $90,000.00 was used for the Ministries.

The Members asserted that they would suffer immediate and irreparable harm if an injunction were not issued (1) to prevent the Church Leadership from entering into a new contract with Dr. Thomas without congregational approval, (2) to require Dr. Thomas to account for funds paid to Hope for Life and to return those funds to MBCC, and (3) to require the Church Leadership to produce proof that Dr. Thomas earned the bonuses he received.

In an attempt to resolve the dispute, the Church Leadership agreed to conduct a special election on December 15, 2002 for the purpose of allowing the congregation to vote on Dr. Thomas' retention. On December 2, 2002, the chancellor submitted a notice to the congregation of MBCC informing them of the upcoming election and setting forth the following ballot to be voted on: (1) "Should [Dr. Thomas] be retained as Senior Pastor of [MBCC]?" and (2) "Should the [MBCC's] Constitution and By-laws be amended to specifically reserve for the congregation the right to approve annually the retention of the Senior Pastor and the Senior Pastor's employment compensation?" On December 3, 2002, the chancellor entered an "Order Establishing Further Election Guidelines" which purported to set the times for voting, appointed a special master to oversee the election, and instructed that "ten (10) Shelby County Deputies and a Supervisor shall assist the Special Master in conducting the election at no expense to MBCC." On December 15, 2002, a majority of the congregation of MBCC voted to retain Dr. Thomas as Senior Pastor and voted against the congregation's involvement in an annual review of the Senior Pastor's retention thereafter.

Dissatisfied with the result of the election, the Members filed an "Amended Complaint for Injunctive Relief and Derivative Action." The amended complaint sought, in essence, the same injunctive relief prayed for in the original complaint. However, the Members subsequently asserted that their property rights were not addressed by the election, therefore, they submitted the amended complaint to reiterate these issues. The amended complaint also contained a derivative cause of action asserting that Dr. Thomas and the Church Leadership misappropriated church funds. On the same day that they filed their amended complaint, the Members also filed a petition for contempt alleging that Dr. Thomas and the Church Leadership violated the chancery court's December 3, 2002 "Order Establishing Election Guidelines," which ordered that "the parties are enjoined from undertaking or directing any acts of harassment, retaliation or threat toward each other." On March 24, 2003, the Church Leadership answered the Members' amended complaint raising the following defense: "The Court lacks subject matter jurisdiction of [the Members'] claims on the basis that the issues raised in the Amended Complaint are of an ecclesiastical nature and are therefore not justiciable."

On July 29, 2003, the parties appeared for a hearing on the Members' petition for contempt, however, they spent the entire day negotiating a settlement of the case. Later that day, the parties appeared before the chancellor to announce that they had reached an agreed settlement in the case. As a result, the chancellor entered an order on August 1, 2003, stating: "Comes now the parties and announce to the Court that all matters in controversy have been compromised and settled pursuant to the attached Settlement Agreement. Accordingly, this matter shall be dismissed with prejudice." The chancellor attached the agreement to the order and entered both into the record. At some point during the course of the proceedings in the trial court, the Members were apparently excommunicated from MBCC.

Shortly after the chancery court entered the order dismissing the case, some of the Members began filing petitions for contempt alleging that Dr. Thomas and the Church Leadership violated various provisions of the settlement agreement. The parties settled all but one of the petitions for

contempt. After conducting a hearing on the remaining petition, the chancellor entered an order on August 13, 2004 finding Dr. Thomas and the Church Leadership in civil and criminal contempt of the chancery court's August 1, 2003 order. Despite the Appellants' continued assertion that the chancery court lacked subject matter jurisdiction over the matter, the chancellor found that "this Court has the authority to adjudicate the breach of contract controversy pending in this proceeding." The chancellor sanctioned the Appellants by imposing fines and jail time for various violations of the previous order.

The Appellants filed a timely notice of appeal to this Court presenting a myriad of issues for our consideration, primarily arguing that the chancery court erred when it found them in contempt of the court's order. The Appellees present the issue of whether the chancery court erred by not restoring their membership rights at MBCC when it ruled on their petition for contempt. Findings of civil and/or criminal contempt are properly appealable to this Court. *See* Tenn. Code Ann. § 16-4-108(b) (1994). We have determined the following to be the sole dispositive issue in this case: whether the chancery court had subject matter jurisdiction over the case from the outset. After reviewing the record, we conclude that it did not, therefore, we reverse the chancery court's ruling on the Appellees' petition for contempt and dismiss the case entirely.

## II. DISCUSSION

In the August 13, 2004 order finding the Appellants in contempt, the chancellor stated that he had the authority to rule on the Members' petition for contempt because the court was "adjudicat[ing] the breach of contract controversy pending in this proceeding." The Appellants argue that, by entering into the settlement agreement, they did not waive their ability to assert their First Amendment rights. In conformity with this position, the Appellants argue that the chancery court did not have subject matter jurisdiction to adjudicate the contempt petition because, in doing so, the chancellor was required to impermissibly decide matters which were entirely ecclesiastical in nature. Conversely, the Members argue that, when the trial court incorporated the settlement agreement into the order dismissing the case, the settlement agreement became the order of the court. The Members contend, therefore, that subsequent violations of the provisions of the settlement agreement are the proper subject of a petition for contempt.

"The phrase 'contempt of court' is generic, embracing within its legal signification a variety of different acts." 17 C.J.S. *Contempt* § 3 (1999). "[A]t common law, the power of courts to punish contempts was vast and undefined." ***Black v. Blount***, 938 S.W.2d 394, 397 (Tenn. 1996) (citing ***State v. Galloway***, 45 Tenn. (1 Cold.) 326, 331 (Tenn. 1868)). As a result of the unfettered discretion exercised by courts at common law, the legislature promulgated statutes to govern contempts of court in this state. ***Id.***; *see also **Reed v. Hamilton***, 39 S.W.3d 115, 118 (Tenn. Ct. App. 2000). The scope of a court's power to enter a finding of contempt of court is now limited to the following:

The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:

(1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;

(2) The willful misbehavior of any of the officers of such courts, in their official transactions;

(3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts;

(4) Abuse of, or unlawful interference with, the process or proceedings of the court;

(5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or

(6) Any other act or omission declared a contempt by law.

Tenn. Code Ann. § 29-9-102 (2000). The courts of this state retain their inherent authority to inflict punishment for contempts of court in the instances set forth in the statute. *See Graham v. Williamson*, 164 S.W. 781, 782 (Tenn. 1913); *Reed*, 39 S.W.3d at 117–18. The statute expressly makes disobedience of an order of the court a contemptuous act. Tenn. Code Ann. § 29-2-102(3) (2000); *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993). Thus, in order to properly find the Appellants in contempt, the chancery court necessarily needed to find that they violated a specific order of the court. *See Doe v. Bd. of Prof'l Responsibility of the State of Tenn.*, 104 S.W.3d 465, 471 (Tenn. 2003) ("It is fundamental that one may not be held in contempt unless he or she violates a specific order of a tribunal properly having jurisdiction of that person.").

"The resolution of disputes by agreement of the parties is to be encouraged." *Harbour v. Brown*, 732 S.W.2d 598, 599 (Tenn. 1987). "The purpose of compromise is to avoid trial of sharply disputed issues and to dispense with wasteful litigation." 15A C.J.S. *Compromise & Settlement* § 1 (2002). It is well established that "[a] compromise and settlement agreement is merely a contract between the parties to litigation and, as such, issues of enforceability of a settlement agreement are governed by contract law." *Envtl. Abatement, Inc. v. Astrum R.E. Corp.*, 27 S.W.3d 530, 539 (Tenn. Ct. App. 2000); *see also Bennecker v. Fickeissen*, No. E2004-02129-COA-R3-CV, 2005 Tenn. App. LEXIS 706, at *6 (Tenn. Ct. App. Nov. 10, 2005); *O'Mary v. Protech Builders, Inc.*, No. E2000-02539-COA-R3-CV, 2001 Tenn. App. LEXIS 430, at *9 (Tenn. Ct. App. May 12, 2001); *Moxham v. Crafton*, No. M2000-00803-COA-R3-CV, 2001 Tenn. App. LEXIS 322, at *17 (Tenn. Ct. App. May 4, 2001); *Wallace & Wallace, Inc. v. Rosengreen*, No. 688, 1987 Tenn. App. LEXIS 2441, at *5 (Tenn. Ct. App. Jan. 16, 1987). "[A] consent judgment does not represent the reasoned decision of the court but is merely the agreement of the parties, made a matter of record by the court." *Harbour*, 732 S.W.2d at 599–600 (citing *Van Donselaar v. Van Donselaar*, 87 N.W.2d 311, 314 (Iowa 1958)). However, "[a] compromise is the law between the parties and a judicially-

entered settlement agreement that becomes part of the stipulation that ends the litigation has the force and effect of a judicial decree." 15A C.J.S. *Compromise & Settlement* § 33 (2002); *see also Moxham*, 2001 Tenn. App. LEXIS 322, at *17 ("We note that a settlement agreement signed by all the parties may be enforceable like other contracts, but it does not become the judgment of the court until it receives the approval of the trial judge."). Thus, it is well settled that the courts of this state retain the inherent power to enforce settlement agreements. *See Bennecker*, 2005 Tenn. App. LEXIS 706, at *7; *Wallace & Wallace, Inc.*, 1987 Tenn. App. LEXIS 2441, at *4.

There is, however, another body of well-settled law which must guide our resolution of this appeal. "A court cannot render a valid judgment unless it has jurisdiction over the subject matter of the litigation or the cause of action." 49 C.J.S. *Judgments* § 18 (1997). On appeal, the Appellants' arguments focus upon whether the chancery court lacked subject matter jurisdiction in relation to the contempt proceedings. When looking at the chronology of this litigation, we must begin our examination of the trial court's jurisdiction over the subject matter of this case at a much earlier point. When a case is submitted to this Court for review, we must "consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review." Tenn. R. App. P. 13(b) (2005); *State v. Seagraves*, 837 S.W.2d 615, 617–18 (Tenn. Crim. App. 1992).

"Subject matter jurisdiction is the basis for the court's authority to act and cannot be waived." *First Tenn. Bank Nat'l Ass'n v. White*, No. 03A01-9711-CV-00514, 1998 Tenn. App. LEXIS 579, at *2–3 (Tenn. Ct. App. Aug. 20, 1998) (citing *Landers v. Jones*, 872 S.W.2d 674, 675 (Tenn. 1994)). Likewise, a lack of jurisdiction over the subject matter of a controversy cannot be conferred upon the court by the consent of the parties. *County of Shelby v. City of Memphis*, 365 S.W.2d 291, 292 (Tenn. 1963); *Baker v. Mitchell*, 59 S.W. 137, 138 (Tenn. 1900); *Gillespie v. State*, 619 S.W.2d 128, 129 (Tenn. Ct. App. 1981); *Tritschler v. Cartwright*, 333 S.W.2d 6, 8 (Tenn. Ct. App. 1959). The trial court's lack of subject matter jurisdiction may be raised at any time by the parties to the action or by the appellate court *sua sponte* on appeal. *See* Tenn. R. Civ. P. 12.08 (2005) (stating that "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"); *County of Shelby*, 365 S.W.2d at 291 (noting the duty of the appellate courts to *sua sponte* consider the issue of the trial court's subject matter jurisdiction); *Travers v. Abbey*, 58 S.W. 247, 248 (Tenn. 1900) (stating that the subject matter jurisdiction of the trial court "could be raised at any time, and is fatal whenever presented"); *Scales v. Winston*, 760 S.W.2d 952, 953 (Tenn. Ct. App. 1988) ("The issue of subject-matter jurisdiction can be raised in any court at any time."); *Reynolds v. Hamilton*, 77 S.W.2d 986, 988 (Tenn. Ct. App. 1934) ("Where the court has no jurisdiction of the subject-matter, the question may be raised at any time, by either the parties or the court.").

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "The First Amendment's Free Exercise and Establishment Clauses have been made applicable to the states by incorporation into the Fourteenth Amendment." *State ex rel. Comm'r of Transp. v. Med. Bird Black Bear White Eagle*, 63 S.W.3d 734, 760 n.41 (Tenn.

Ct. App. 2001) (citing *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947); *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940)). "Tennessee Courts have long recognized that civil courts have no jurisdiction over inner[-]ecclesiastical matters of the church." *Ausley v. Shaw*, No. M2004-02244-COA-R3-CV, 2005 Tenn. App. LEXIS 709, at *8 (Tenn. Ct. App. Nov. 9, 2005) (citing *Lewis v. Partee*, 62 S.W. 328, 333 (Tenn. 1901)); *see also* Marjorie A. Shields, Annotation, *Construction and Application of Church Autonomy Doctrine*, 123 A.L.R.5th 385 (2004) (discussing the application of the doctrine to various actions); 77 C.J.S. *Religious Societies* § 85 (1994) ("The courts have no jurisdiction over, and no concern with, purely ecclesiastical questions and controversies."). "Together, the First Amendment and Article I, Section 3 of the Tennessee Constitution severely circumscribe the role of civil courts in resolving religious disagreements." *Edmondson v. Church of God*, No. 85-151-II, 1986 Tenn. App. LEXIS 3572, at *15 (Tenn. Ct. App. May 16, 1986).

"Civil Courts deal only with civil and property rights," and "have in this country no ecclesiastical jurisdiction." *Nance v. Busby*, 18 S.W. 874, 879 (Tenn. 1891). "However, a civil court need not stay its hand in every case involving church disputes because not every civil court decision in such cases will jeopardize values protected by the First Amendment." *Edmondson*, 1986 Tenn. App. LEXIS 3572, at *16 (citing *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hall Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). "The jurisdiction of a civil Court to adjudge any ecclesiastical matter must result as a mere incident to the determination of some property right." *Nance*, 18 S.W. at 876; *see also Church of God in Christ, Inc. v. Middle City Church of God in Christ*, 774 S.W.2d 950, 952 (Tenn. Ct. App. 1989) ("Courts have jurisdiction to adjudge ecclesiastical matters only as a mere incident to the determination of some property right."); *Royal Heights Church of Christ v. Williams*, No. 87-60-II, 1987 Tenn. App. LEXIS 2995, at *5 (Tenn. Ct. App. Oct. 21, 1987) ("The courts do have, however, jurisdiction to decide cases where control of property is involved, even though the resolution of the dispute may require the limited examination of ecclesiastical matters."). "However, when our courts have taken jurisdiction over an action arising from an ecclesiastical dispute, they have been careful to decide only the issues dealing with the civil or property right involved using neutral principles of law." *Edmondson*, 1986 Tenn. App. LEXIS 3572, at *17 (citing *Landrith v. Hudgins*, 120 S.W. 783, 807 (Tenn. 1908); *Nance*, 18 S.W. at 879; *Fairmont Presbyterian Church, Inc. v. Presbytery of the Holston of the Presbyterian Church of the U.S.*, 531 S.W.2d 301, 306 (Tenn. Ct. App. 1975)).

In their complaint, the Members sought to enjoin the Church Leadership from entering into a new employment contract with Dr. Thomas until such time as the congregation could vote on whether to retain Dr. Thomas as Senior Pastor. In an effort to resolve the dispute, the Church Leadership agreed to hold a special election to allow the congregation to vote on the retention of Dr. Thomas. Instead of allowing the church to handle the matter, the chancellor proceeded to draft a ballot; submit a notice of the election to the congregation; and enter an order establishing the guidelines for the election process, which included the appointment of a special master to oversee the election and the insertion of sheriff's deputies into the church to assist the special master in administering the election.

"The selection and termination of clergy are generally ecclesiastical matters with which civil courts cannot interfere." 77 C.J.S. *Religious Societies* § 89 (1994); *see also* Dale R. Agthe, Annotation, *Judicial Review of Termination of Pastor's Employment by Local Church or Temple*, 31 A.L.R.4th 851 (1984). In ***Mason v. Winstead***, 265 S.W.2d 561 (Tenn. 1954), our supreme court addressed a chancellor's actions in a church dispute similar to the one presently before this Court. In *Mason*, the congregation elected the pastor in 1948 to serve indefinitely, subject to termination at will by a majority of the church members. ***Id.*** at 562. When the pastor began to use "objectionable language" from the pulpit when referring to certain members, discord spread throughout the church. ***Id.*** Ultimately, six of the trustees of the church filed a complaint in the chancery court seeking an injunction to enjoin the pastor "from conducting services or any other business in said church." ***Id.*** The chancellor ordered the Clerk and Master to oversee an election in which all of the church members were to vote on retention of the pastor. ***Id.*** at 563. The congregation voted unanimously to dismiss the pastor. ***Id.*** Regarding the actions of the chancellor, the supreme court ruled as follows: "We think this procedure was outside the scope of the pleadings, and also beyond the jurisdiction of the court, as the removal of a pastor is an ecclesiastical matter, and the tribunals of the church have exclusive authority in such cases without interference from the civil courts." ***Id.*** (citations omitted); *see also **Travers v. Abbey***, 58 S.W. 247, 248 (Tenn. 1900).

The decision as to whether to retain Dr. Thomas as Senior Pastor at MBCC is purely an ecclesiastical matter. Accordingly, the chancery court did not have subject matter jurisdiction over this aspect of the Members' complaint.

Our inquiry does not end at this point. In an effort to ensure review by the chancery court, the Members inserted the following statement into their complaint: "This suit is not purely an ecclesiastical dispute, it involves property rights so that this court has jurisdiction to hear and determine the matters hereinafter set forth." It is clear from the statements in the Members' complaint they were alleging that, by using church funds in a manner they deemed inappropriate, the Church Leadership and Dr. Thomas infringed upon the Members' property rights. In fact, the Members conceded at oral argument that one of the purposes of their lawsuit was to challenge the spending practices at MBCC.

In a previous case, we addressed the very argument set forth by the Members in the complaint filed in this case, stating: "Since members of a church have no property rights in their contributions to the church, unlike shareholders in other corporations, we cannot conclude that erecting corporate facade over a religious institution thereby secularizes the church's activities so as to confer jurisdiction to civil courts over ecclesiastical questions." ***First Pentecostal Church of Jackson, Inc. v. Johns***, 1984 Tenn. App. LEXIS 2619, at *5 (Tenn. Ct. App. Jan. 24, 1984). "[T]he mere assertion of a property right is not sufficient to invest a civil court with jurisdiction over what is essentially a religious dispute." 77 C.J.S. *Religious Societies* § 85 (1994). Thus, the chancery court lacked subject matter jurisdiction over this aspect of the Members' complaint as well.

Finally, we examine the effect the lack of subject matter jurisdiction had on the chancery court's subsequent actions. "A court acting without jurisdiction is acting without authority of law,

and its decrees are absolutely void." ***Sheffy v. Mitchell***, 215 S.W. 403, 404 (Tenn. 1919); ***see also County of Shelby v. City of Memphis***, 365 S.W.2d 291, 292 (Tenn. 1963) (noting that an order entered without subject matter jurisdiction is a nullity); ***Mora v. Mora***, No. W1999-02483-COA-R3-CV, 2001 Tenn. App. LEXIS 422, at *12 (Tenn. Ct. App. June 4, 2001) ("Any order entered by a court without subject matter jurisdiction is a nullity and is therefore unenforceable."); ***Scales v. Winston***, 760 S.W.2d 952, 953 (Tenn. Ct. App. 1988) ("It is the duty of any court to determine the question of its subject matter jurisdiction on its own motion if the issue is not raised by either of the parties, inasmuch as any judgment rendered without jurisdiction is a nullity."). "If the Chancery Court had no jurisdiction of the subject matter in this case, the only decree that could be entered by that Court or this Court would be a dismissal of the suit." ***Tritschler v. Cartwright***, 333 S.W.2d 6, 8 (Tenn. Ct. App. 1959) (citations omitted). We are cognizant of the need to promote compliance with the orders issued by the courts of this state. However, the following general principle of law controls our resolution of this contentious case: "Disobedience of a mandate, order, judgment, or decree which is void or issued by a court without jurisdiction *is not a contempt*, but disobedience of an erroneous order, if made by a court within its jurisdiction, constitutes contempt." 17 C.J.S. Contempt § 16 (1999) (emphasis added); ***see also State v. Ragghianti***, 167 S.W. 689, 690–91 (Tenn. 1914) ("'*Unless an injunction order is void upon its face for lack of jurisdiction on the part of the judge who granted it*, it must be obeyed, however erroneous the granting of it may have been, until it is dissolved on motion or appeal or some other method of direct review in the action in which it was granted.'") (emphasis added)). Since the order on which the chancery court based its finding of contempt is void as a matter of law, the chancery court erred in finding that any disobedience of that order constituted contempt.

### III. CONCLUSION

If, after reviewing the record, we are able to ascertain that the trial court lacked subject matter jurisdiction over the controversy, we must dismiss the case outright. ***Reynolds v. Hamilton***, 77 S.W.2d 986, 988 (Tenn. Ct. App. 1934). Having so found, we reverse the chancery court's order finding the Appellants in contempt, and we dismiss this case in its entirety. Insofar as the Appellees sought reinstatement to the membership rolls of MBCC in the course of the contempt proceedings, we find this issue to be pretermitted given our need to dismiss this case.[3] Costs of this appeal are

---

[3] Even if the Members had raised their excommunication from MBCC as a cause of action in their complaint, the act of excluding them from membership would not vest the chancery court with subject matter jurisdiction. Our supreme court has previously held that questions regarding the admission and expulsion of members to a church are purely ecclesiastical in nature, stating:

> The relations of a member to his church are not contractual. No bond of contract, express or implied, connects him with his communion or determines his rights. Church relationship stands upon an altogether higher plane, and church-membership is not to be compared to that resulting from connection with mere human associations for profit, pleasure, or culture. The church undertakes to deal only with the spiritual side of man. It does not appeal to his purely human and temporal interests. Admission to its fold is prescribed alone by the church,

(continued...)

[3] (...continued)

professing to act only upon the word of God. It claims the power of the keys by divine and not human authority. Its right to determine the grounds of admission has never been questioned. Why shall the co-ordinate right of exclusion be scrutinized by the civil power? No property rights of a personal kind depend upon membership. No pecuniary right, or civil right of any character, was affected by expulsion. . . . Although expulsion deprived the member of his rights as a corporator to vote for trustees, yet, as his rights as a corporator depended upon his connection with the church, he was held to have no action against the corporation or any right to be re-instated.

. . . .

We are not to be understood as approving an expulsion from church-membership by irregular methods and without notice to the member. But here we have a fact to be dealt with—the fact that this church, sitting as a court, has determined for itself that it had the power and the right to exclude these complainants. They have, as a judicature, adjudged that they had the jurisdiction, and that the usage and law of the church did not demand other trial or notice than such as attended the public action of the church. The law of the church provides for no appeal to a higher tribunal. *They may have erred in their procedure. It is not for a civil Court to revise their action in a matter so vital to their freedom as a church.*

. . . .

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no church. The right to organize voluntary religious associations, to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. *All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it.* But it would be a vain consent, and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions should appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides."

. . . .

"This Court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church-discipline or excision. Our only judicial power in the case arises from the conflicting claims of the parties to the church-property and the use of it. And these we must decide as we do all other civil controversies brought to

(continued...)

to be taxed to the Appellees, Melvin Foster *et al.*, for which execution may issue if necessary.

This Court entered an Order on August 19, 2004, addressing the Appellants' motion for a stay of the chancery court's ruling pending the outcome of this appeal. Therein, we granted said motion on condition that the Appellants post a bond in the amounts designated in the Order. Given our disposition of this case on appeal, we now release the bonds and vacate our prior Order.

_____
ALAN E. HIGHERS, JUDGE

_____

[3](...continued)
> this tribunal for ultimate decision. *We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church. We must take the fact of expulsion as conclusive proof that the persons expelled are not now members of the repudiating church, for, whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this Court.*

*Nance v. Busby*, 18 S.W. 874, 879–81 (Tenn. 1891) (emphasis added); *see also Fowler v. Bailey*, 844 P.2d 141, 145 (Okla. 1992) ("Church membership, by itself, is not a civil or property right subject to civil judicial regulation, and we will not compel a church to reinstate a member.").